**ZENITH ELECTRONICS CORPORATION, et al., Plaintiffs,**

v.

**The UNITED STATES, Defendant,**

and

**Action Electronics Co., Ltd., Proton Electronic Industrial Co., Ltd. (a/k/a Fulet Electronic Industrial Co., Ltd.), and Tatung Co., Defendant–Intervenors.**

Slip Op. 94–196.
Court No. 93–07–00404.

United States Court of International Trade.

Dec. 16, 1994.

Frederick L. Ikenson, P.C., Frederick L. Ikenson and Larry Hampel, for plaintiff Zenith Electronics Corp.

White & Case, William J. Clinton, Christopher Curran, George L. Paul and David E. Bond, for plaintiffs and defendant-intervenors Action Electronics Co., Ltd., Proton Electronic Indus. Co., Ltd., a/k/a Fulet Electronic Indus. Co., Ltd., and Tatung Co.

Frank W. Hunger, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Civ. Div., U.S. Dept. of Justice, Michael S. Kane, Thomas H. Fine, Atty. Advisor, U.S. Dept. of Commerce, of counsel, for defendant.

## OPINION

RESTANI, Judge:

This matter is before the court on separate motions for judgment on the agency record pursuant to USCIT Rule 56.2. Action Electronics Company, Ltd., ("Action"), Proton Electronic Industrial Company, Ltd., ("Proton"), Tatung Company ("Tatung") (collectively "respondents"), and Zenith Electronics Corporation ("Zenith") challenge the final results of the antidumping duty administrative review in *Color Television Receivers, Except for Video Monitors, from Taiwan*, 58 Fed. Reg. 34,415 (Dep't Comm.1993) (eighth admin. review). The issues presented for review are whether the International Trade Administration of the Department of Commerce ("Commerce") erred in failing to conduct a full investigation into Zenith's standing; whether Commerce erred in its adjustment to United States price ("USP") for taxes uncollected or rebated due to the exportation of the merchandise; whether Commerce erred in its adjustment to USP for commodity tax paid by Tatung on home market goods; and whether Commerce erroneously compared Proton's U.S. sales to constructed value ("CV") rather than to actual prices of home market comparison models.

## BACKGROUND

On April 30, 1984, Zenith petitioned Commerce to conduct a review of the antidump-

ing duty order covering color television receivers ("CTVs") from Taiwan. *See Color Television Receivers, Other Than Video Monitors, from Taiwan,* 49 Fed.Reg. 18,337 (Dep't Comm.1984) (antidumping duty order notice). Zenith asserted it was a domestic producer of CTVs. On May 22, 1992, Commerce published a notice of initiation of the eighth administrative review covering the period April 1, 1991 through March 31, 1992. *Initiation of Antidumping and Countervailing Duty Administrative Reviews,* 57 Fed. Reg. 21,769 (Dep't Comm.1992).

On June 11, 1992, respondents challenged the standing of Zenith to request a periodic review under 19 U.S.C. § 1675(a) (1988), presenting copies of newspaper articles, based on a Zenith press release, financial statements and other data indicating U.S. assembly operations were being moved to Mexico. Zenith submitted an affidavit on June 16, 1992 from its vice president and general counsel, John Borst, Jr., stating that (1) Zenith's Springfield, Missouri facility "will continue to produce approximately 4,000–6,000 CTVs per month;" (2) the Springfield facility will "continue to employ approximately 500 people;" and (3) "Zenith's capital investment in the [United States] related to its CTV business is in excess of $250,000,000." Def.'s Resp.Opp'n Resp'ts' Mot.J. Agency R., App. at 6 ("Borst Aff."). On June 29, 1992, respondents again contested Zenith's standing. Commerce reviewed the information submitted by both sides and concluded:

> The October 29, 1991, press release (and the other public statements that Zenith has made concerning this matter) can not be interpreted to indicate that Zenith *has* withdrawn from U.S. CTV production. In these statements Zenith has indicated only that it *plans* to consolidate CTV final assembly in Mexico, and that if and when this consolidation occurs, it would happen sometime after March 22, 1992. Additionally, the statements do not indicate that the consolidation will result in a total cessation of domestic production. Moreover, the respondents appear to admit that Zenith has not fully withdrawn from domestic production of CTVs. In their June 11 submission, the respondents state '... whatever truth there is to Zenith's claim to

> being a U.S. producer in April of 1992 [the anniversary month] any such claim will disappear soon.'

*Id.,* App. at 4–5 (Memorandum to Alan M. Dunn from Joseph A. Spetrini (July 24, 1992)) ("*Spetrini Memorandum*").

Commerce's questionnaires, issued on June 5, 1992, requested, *inter alia,* that respondents "[l]ist all internal taxes imposed on the home market models, which were either rebated upon exportation or not collected on the models exported to the United States." Resp'ts' App.Supp.Mot.J. Agency R., Tab 11, at 26 ("Sample Questionnaire"). The questionnaire further requested respondents to provide information concerning the tax base, tax rate, amount of taxes assessed, any deductions, credits or offsets to the tax, and the tax formula used for each comparison product. *Id.* Commerce also sought information pertaining to duty drawback, requesting that respondents tie the amounts to the exported merchandise. *Id.* at 46. In addition, the questionnaire requested descriptions of home market comparison models, as well as sales data, so that Commerce could determine whether the exported models and the comparison models were sufficiently similar. *Id.* at 12, 14.

Respondents answered Commerce's questionnaires on August 7, 1992. In their submission, respondents provided all the information Commerce requested on internal taxes, including commodity taxes. With respect to commodity taxes, Tatung listed the values of commodity taxes paid on home market sales, but included them as a component of U.S. sales. Respondents also notified Commerce that the questions concerning duty drawback did not apply. They explained that they would have paid import duties on component parts of the subject merchandise, however, because each company sold their goods from "bonded" warehouses, the duties were neither assessed nor collected. Hence, respondents listed the exempt import duties as an internal tax because they were assessed as a percentage of the duty paying value ("DPV") of home market models sold in Taiwan. Respondents further suggested methodologies for calculating the DPV of the

exported models based on the material differences between home market and export merchandise.

In its response, Proton submitted descriptions of its home market models and U.S. models, provided relevant sales and expense data, and suggested home market comparison models for each U.S. model, so that Commerce could calculate foreign market value ("FMV"). On September 11, 1992, Zenith alleged that Proton's sales of its proposed home market comparison models were below the cost of production ("COP"). Commerce notified Proton of these concerns on October 7, 1992. In response to supplemental Commerce questionnaires, Proton submitted additional information suggesting different home market comparison models on October 20, 1992 and provided more detailed descriptions of home market and U.S. models on November 6, 1992, identifying such characteristics as screen size, dimensions, type of set, tuner, number of channels, audio performance and number of speakers.

On January 13, 1993, Commerce published the preliminary results of the administrative review. *Color Television Receivers, Except for Video Monitors, from Taiwan,* 58 Fed. Reg. 4148 (Dep't Comm.1993) (prelim. admin. results). Commerce did not question respondents' classification of the exempted import duties as internal taxes, nor did it question respondents' use of home market models as the basis for the duty adjustment. In fact, it stated that "[w]here appropriate, we also made an addition to [USP] for import duties which were rebated, or which were not collected, by reason of the exportation of the merchandise to the United States." 58 Fed. Reg. at 4149. Commerce also noted that it "could find no contemporaneous, home-market sales of such or similar merchandise above the COP" for Proton, and used CV to calculate FMV. *Id.*

On June 25, 1993, Commerce published the final results of the eighth administrative review. 58 Fed.Reg. at 34,415. In the final determination, Commerce reiterated that respondents had produced insufficient evidence to call Zenith's standing into question so as to require further investigation. *Id.* at 34,-416. Commerce also stated that with respect to adjustments to USP for taxes, including commodity taxes, pursuant to 19 U.S.C. § 1677a(d)(1)(C) (1988), it would "add to USP the absolute amount of tax on the comparison merchandise sold in the country of exportation." *Id.* at 34,415. Commerce further explained that this methodology would not create or inflate dumping margins. *Id.* Commerce also noted that after reviewing its calculations, it concluded that respondents had "inappropriately based their claim for duty drawback upon the import duties associated with home-market comparison models.... [and] [a]ccordingly disallowed the [respondents'] duty drawback claims." *Id.* at 34,415–16. Commerce affirmed its preliminary use of CV for Proton's home market comparison models, finding no contemporaneous home market sales based on Proton's original August 7, 1992 submission. *Id.* at 34,420.

## STANDARD OF REVIEW

Upon review of a final determination of an administrative review, the court must determine whether the decision is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (1988). Substantial evidence is that which "'a reasonable mind might accept as adequate to support a conclusion.'" *Matsushita Elec. Indus. Co. v. United States,* 750 F.2d 927, 933 (Fed.Cir. 1984) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)).

## DISCUSSION

I. *Tatung's Challenge to Zenith's Standing to Request Administrative Review*

Tatung argues that Commerce improperly failed to conduct an investigation into Zenith's standing even though Tatung produced reliable information (including Zenith's own press release) establishing that Zenith was no longer a domestic producer of CTVs. It is clear that Commerce did not undertake a full investigation of Zenith's standing. Rather, having accepted Zenith as a domestic producer in the original investigation and in numerous periodic reviews, it placed the bur-

den upon respondents to demonstrate a serious question as to Zenith's standing. *See* Spetrini Memorandum at 5. Tatung believes it has met that burden because Zenith's own press release of October, 1991, and its annual report for that year, as well as trade adjustment petition filings, indicated that as of March 1992 CTV assembly would be moved to Mexico. This is quite inconsistent with Zenith's sworn statements in June 1992 that, in fact, an assembly line with significant output remained in the United States. *See* Borst Aff. at 6.

The court finds that certain of Commerce's conclusions made in the course of analysis of these various statements are incorrect. Specifically, Commerce erred in concluding that there was no conflict between the October 29, 1991 press release and the June 16, 1992 factual submission of Zenith. The 1991 press release, describing Zenith's intent to move all assembly to Mexico was clearly inconsistent with the fact that as of June 1992, one assembly line was said to remain. Furthermore, neither respondents' statements nor the press release can be read to mean that the consolidation in Mexico would begin as of March 22, 1992, the expiration date of a then-existing labor agreement. The plain words of the news release indicate the consolidation would be complete by that date.

■ Nonetheless, a reasonable trier of fact could have concluded that the 1991 statements of intent were overly optimistic (or pessimistic) and that the June 1992 statements of fact carried more weight. The court does not believe any rereading or reassessment by Commerce of the 1991 statements would alter its overall conclusion that a full investigation was unwarranted. In conducting an administrative review, Commerce does not write on a clean slate. *Matsushita Elec.*, 750 F.2d at 932. Furthermore, even in original investigations, Commerce may presume standing, absent evidence to the contrary. *See Minebea Co. v. United States*, 984 F.2d 1178, 1181 (Fed.Cir.1993); *Trent Tube Div. v. Avesta Sandvik Tube AB*, 975 F.2d 807, 812–13 (Fed.Cir.1992); *Suramerica de Aleaciones Laminadas, C.A. v. United States*, 966 F.2d 660, 667 (Fed.Cir.

1992). The question is what degree of evidence should prompt Commerce to commence an investigation into standing in an administrative review. This question is not answered by the statute or the regulation. Certainly, if Zenith's 1991 statements of intent had gone unrebutted, serious investigation would have been warranted, but, as indicated, the court cannot say Commerce erred in accepting and believing the June 1992 sworn statement of fact presented by Zenith.

■ Respondents have cited often and at length to *Creswell Trading Co. v. United States*, 15 F.3d 1054 (Fed.Cir.1994). *Creswell* does not apply here, as the burden of production of evidence to rebut standing has been allocated by the Federal Circuit to the party challenging standing. *See Minebea*, 984 F.2d at 1181. Nonetheless, the burden cannot be set so high that persons in the position of respondents cannot meet it. Further, respondents cannot be expected to get helpful statements from current employees. Respondents will not be granted admission to investigate domestic production facilities. Respondents can monitor SEC filings and news releases, as they did. Commerce is obligated to consider seriously any statements by Zenith in such news releases and filings.

In this particular instance, Commerce did act on respondents' charge. Commerce assessed the evidence and the court does not fault the agency for accepting the sworn statements of present fact over prior statements of intent. Commerce, thus, did not abuse its discretion by not conducting a wide-ranging investigation of Zenith's standing.

II. *Zenith's Challenge to Adjustment for Taxes Forgiven Upon Export*

■ This issue is well settled in this court. For a further explanation see *Independent Radionic Workers v. United States*, 862 F.Supp. 422, 426 (Ct.Int'l Trade 1994). Thus, the court grants both Zenith's and Commerce's request for a remand to recalculate respondents' USP in accordance with Commerce's new methodology for taxes for-

given upon export.[1]

### III. *Tatung's Tax Adjustment Challenge*

Tatung argues that, in its questionnaire response, it included the absolute amount of commodity taxes paid on home market sales. Believing that the commodity taxes would be added to USP pursuant to 19 U.S.C. § 1677a(d)(1)(C), Tatung claimed these figures as an adjustment to USP. Tatung contends that in the final results, Commerce intended to add to USP the amount of commodity tax assessed on the home market goods for both Proton and Tatung, however, Commerce inadvertently used the wrong entry in Tatung's submission, effectively negating Tatung's adjustment.

Commerce asserts that Tatung's figures are based on home market models and is thus inconsistent with its new methodology. The court agrees. As this entire issue is remanded, the court directs Commerce to calculate Tatung's commodity tax adjustment in accordance with its new methodology and to request any pertinent data from Tatung which was not previously sought because of application of an erroneous methodology by Commerce.[2]

### IV. *Adjustment to USP for Import Duties Forgiven Upon Export*

Commerce is also required to make an upward adjustment to USP for import duties pursuant to 19 U.S.C. § 1677a(d)(1)(B). The statute provides that USP be increased by

> the amount of any import duties imposed by the country of exportation which have been rebated, or which have not been col-

lected, by reason of the exportation of the merchandise to the United States.

*Id.;* see 19 C.F.R. § 353.41(d)(1)(ii) (1992).

Respondents claim that Commerce failed to adjust USP for import duties that were not collected due to exportation of the merchandise to the United States. Respondents argue that, in previous administrative reviews and in the preliminary determination, Commerce granted this adjustment even though respondents listed the import duties, in their questionnaire responses, as an adjustment for internal taxes, uncollected by reason of export. Respondents allege that such actions led them to conclude that Commerce was satisfied with the listing of the uncollected import duties under the provision for uncollected internal taxes. Thus, respondents argue, Commerce denied them any notice or opportunity to comment. Respondents request that the court remand this issue to Commerce and order Commerce to grant the adjustments.

Commerce argues that the duties cannot be classified as an internal tax within the meaning of 19 U.S.C. § 1677a(d)(1)(C), because the rate of duties varies with the identity and country of origin of the merchandise being assessed, and any adjustment for such duties should have been claimed in the questionnaire response as "duty drawback."[3] Commerce notes that even if the data submitted in response to the question concerning internal taxes was used to calculate an adjustment to USP, respondents inappropriately based their claim upon the import duties assessed on home-market comparison models and were unable to link their claim to exported merchandise.

In its questionnaire, Commerce requested that respondents provide information concerning duty drawback, and indicated that respondents link that information to exported merchandise.[4] Sample Questionnaire at 46.

---

1. On November 23, 1994, respondents filed a motion to dismiss Zenith's challenge before this court, based on lack of standing. As both Commerce and respondents also request a revision of this adjustment, dismissal of Zenith's challenge will have no effect on the remand.

2. Commerce indicates it has sufficient evidence to make the proper calculations.

3. "Duty drawback" is the remission or rebate of duties assessed and paid on imported inputs of

merchandise that is subsequently exported. *See* 19 U.S.C. § 1313(a) (1988); *Federal–Mogul Corp. v. United States,* 862 F.Supp. 384, 410 (Ct.Int'l Trade 1994).

4. The questionnaire requested that respondents "[r]eport the total amount of duty drawback ... *received* on each model ... exported to the United States." Sample Questionnaire at 46 (emphasis added).

Respondents correctly point out, however, that as they sold the subject merchandise from bonded warehouses and did not pay any duties on imported inputs, the duty drawback provisions did not clearly apply to them. They instead claimed the import duties as an adjustment for internal taxes, reasoning that because the duties for goods sold from a bonded warehouse in the home market were assessed *ad valorem* on the DPV of the finished merchandise, a claimed adjustment for internal taxes was more appropriate. Respondents argue that they complied with the methodology in force at the time for internal taxes and supplied Commerce with information concerning the duties, paid as taxes, on home market comparison models, pursuant to the questionnaire and 19 U.S.C. § 1677a(d)(1)(C). As indicated, Commerce granted similar adjustments to respondents in previous reviews, *see, e.g., Color Television Receivers, Except for Video Monitors, from Taiwan,* 57 Fed.Reg. 20,241 (Dep't Comm. 1992) (seventh final admin. review); *Color Television Receivers, Except for Video Monitors, from Taiwan,* 57 Fed.Reg. 555, 555 (Dep't Comm.1992) (seventh prelim.); *Color Television Receivers, Except for Video Monitors, from Taiwan,* 56 Fed.Reg. 65,218 (Dep't Comm.1991) (fourth and sixth final admin. reviews); *Color Television Receivers, Except for Video Monitors, from Taiwan,* 56 Fed. Reg. 36,765, 36,766 (Dep't Comm.1991) (fourth and sixth prelim.), and had granted the adjustment in the preliminary results of this administrative review. *Color Television Receivers,* 58 Fed.Reg. at 4149.

Commerce's questionnaire was unclear as to how respondents should characterize uncollected import duties that were paid on similar goods sold in the home market. *See supra* note 4. As duty drawback can reasonably be viewed as referring only to duties which are paid and rebated, rather than uncollected, respondents reasonably concluded

that the provision did not apply to them, and attempted to claim an adjustment for internal taxes.[5] The court agrees with Commerce that these import duties should not be classified as taxes within the meaning of 19 U.S.C. § 1677a(d)(1)(C), and that 19 U.S.C. § 1677a(d)(1)(B) applies.

■ The court also finds, however, that total denial of adjustment for uncollected duties in this case constitutes procedural unfairness. *See Sigma Corp. v. United States,* 841 F.Supp. 1255, 1267 (Ct.Int'l Trade 1993); *Böwe–Passat v. United States,* Slip Op. No. 93–68, at 14, 1993 WL 179269 (May 7, 1993). Respondents cannot be held to have reported their adjustments according to a methodology for internal taxes, which Commerce had not yet accepted.[6] Also, whether Commerce's drawback questions can be answered in any appropriate way as to uncollected duties is not clear. Thus, the court remands this issue to Commerce to develop a methodology for calculating an adjustment to USP for import duties not collected by reason of the exportation of the merchandise, and to apply this methodology to respondents. Although respondents seem to have submitted information that may be sufficient, if inadequate information exists in the record, clear questions should be submitted to the affected respondents.

## V. Use of Constructed Value for Proton's Home Market Sales

■ In an antidumping duty case, Commerce's basic task is to determine FMV of the imported merchandise in order to perform comparisons with USP and calculate any dumping margins that may exist. *See Timken Co. v. United States,* 10 CIT 86, 95–96, 630 F.Supp. 1327, 1336 (1986). Under 19 U.S.C. § 1677b(a)(1)(A) (1988), Commerce is required to calculate FMV as the price:

---

5. The court is aware that Commerce's erroneous methodology for internal taxes that was applied in this proceeding was very favorable to respondents and, thus, respondents would have preferred to treat the adjustment as one for uncollected taxes as opposed to duties, rebated or uncollected. This self-serving aspect of respondents' conduct, however, does not change the fact that the questionnaire is unclear and that Commerce had accepted respondents' approach.

6. Commerce's new methodology for taxes would require information more appropriate to the duty adjustment, as well.

at which such or similar merchandise [7] is sold or, in the absence of sales, offered for sale in the principal markets of the country from which exported, in the usual commercial quantities and in the ordinary course of trade for home consumption.

*Id.* When Commerce determines that sales of the "such or similar" merchandise were made at below COP, and any remaining sales that were not made at below COP are inadequate as a basis for FMV, it is required to employ constructed value to determine FMV. 19 U.S.C. § 1677b(b) (1988); *see also IPSCO, Inc. v. United States,* 965 F.2d 1056, 1059 (Fed.Cir.1992) ("[T]he statute [19 U.S.C. § 1677b(b)] directs computation of a constructed value in lieu of the foreign market value.").

■ In the final determination, Commerce found some of Proton's home market comparison models to have been sold at below COP, thus it used CV to make comparisons to USP. *See* 58 Fed.Reg. at 34,420. Proton argues that Commerce erred in resorting to CV because sufficient information concerning other "such or similar" models for purposes of comparison to USP were provided in its initial questionnaire response of August 7, 1992. Proton further claims that it provided Commerce with additional information of similar home market models in its November 6, 1992 supplemental response. Proton's suggestions for alternate model matches on December 4, 1992, however, were not submitted timely. *See id.* Nonetheless, Proton maintains that Commerce had an affirmative duty to use the information provided to find alternative comparison models before resorting to CV. Proton does not contest the finding that the comparison model sales, selected by Commerce on Proton's recommendation, were sold below COP.

Commerce contends that application of CV is mandated by the statute when comparison sales are found to be below COP, and any remaining sales above COP are an insufficient basis for FMV. For five of the U.S. models, Commerce used sales of the identical home market model for comparison purposes; for the remaining three, in the absence of identical matches, Commerce used models that Proton claimed were similar to the U.S. models in component material. This is in accord with *Timken Co.,* 10 CIT at 96, 630 F.Supp. at 1336–37. In the next step, based on the data supplied by Proton, Commerce determined that for certain of the comparison models, sales were made at below COP. 58 Fed.Reg. at 4149. Thus, pursuant to 19 U.S.C. § 1677b(b), Commerce used CV as the FMV for those models. *See id.; see also IPSCO, Inc.,* 965 F.2d at 1059.

Respondents now argue that § 1677b(b) should be read so that if any merchandise meeting one of the definitions of "such or similar" under 19 U.S.C. § 1677(16) survives the COP test, the actual prices of such merchandise should be used for price comparison purposes. The court rejects this argument. Where the class or kind of merchandise under review covers a number of different models, it has long been Commerce's practice to seek model match information and to subdivide the class so that it may make fair price comparisons. *See Hussey Copper, Ltd. v. United States,* 834 F.Supp. 413, 418 (Ct.Int'l Trade 1993) (noting that Commerce has authority to determine most similar merchan-

---

7. "Such or similar merchandise" is defined in 19 U.S.C. § 1677(16) (1988) as:

[M]erchandise in the first of the following categories in respect of which a determination ... can be satisfactorily made:
   (A) The merchandise which is the subject of an investigation and other merchandise which is identical in physical characteristics with, and was produced in the same country by the same person as, that merchandise.
   (B) Merchandise—
   (i) produced in the same country and by the same person as the merchandise which is the subject of the investigation,

(ii) like that merchandise in component material or materials and in the purposes for which used, and
(iii) approximately equal in commercial value to that merchandise.
   (C) Merchandise—
   (i) produced in the same country and by the same person and of the same general class or kind as the merchandise which is the subject of the investigation,
   (ii) like that merchandise in the purposes for which it is used, and
   (iii) which the administering authority determines may reasonably be compared with that merchandise.
*Id.*

dise and methodology used). Once the model matches are established and the COP test is completed, Commerce is not required to re-examine all of the undifferentiated model data in order to make new matches and price comparisons on the basis of whatever subset of lower-ranked such or similar merchandise survives the COP test. Section 1677b(b) does not direct such a result.[8]

In this case Commerce used actual prices for some model match comparisons and CV for those that failed COP analysis. The court determines that Commerce's decision to use CV for models for which there were no sales at or above the cost of production in the home market is in accordance with law.

## CONCLUSION

In conclusion, the court does not find that Commerce abused its discretion by not conducting an investigation into Zenith's standing. The court grants Zenith's and Commerce's request for remand to calculate respondents' USP in accordance with Commerce's new methodology for taxes forgiven upon export. Commerce is also directed to establish a methodology for calculating an adjustment for uncollected import duties on exported merchandise, if necessary, to collect data from Tatung for such purpose, and to make such adjustment. Finally, the court finds Commerce's use of CV for Proton's comparison sales to be in accordance with law.

Remand results are due within 45 days hereof. Any objections are to be filed within 20 days thereafter and responses are due 10 days thereafter.

---

**8.** This situation should not be confused with this court's rejection of Commerce's resort to CV when initial attempts at most similar model matches fail. *See Koyo Seiko Co. v. United States,* 810 F.Supp. 1287, 1290 (Ct.Int'l Trade 1993), *rev'd on other grounds,* 36 F.3d 1565 (Fed.Cir. 1994). Such rejection did not involve COP failure of the agreed matched model.