**FAG U.K. LTD., The Barden Corporation (U.K.) Ltd., The Barden Corporation and FAG Bearings Corporation; NSK–RHP Europe Ltd. and RHP Bearings Ltd., Plaintiffs and Defendant–Intervenors,**

**v.**

**UNITED STATES, Defendant,**

**The Torrington Company, Defendant–Intervenor and Plaintiff.**

**Slip Op. 96–177.**
**Court No. 95–03–00335–S1.**

United States Court of International Trade.

Nov. 1, 1996.

Grunfeld, Desiderio, Lebowitz & Silverman LLP (Max F. Schutzman and Andrew B. Schroth), New York City, for plaintiff and defendant-intervenor FAG.

Covington & Burling (Harvey M. Applebaum, David R. Grace and Mark F. Kightlinger), Washington, DC, for plaintiff and defendant-intervenor NSK–RHP.

Frank W. Hunger, Assistant Attorney General; David M. Cohen, Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (Velta A. Melnbrencis); of counsel: Mark A. Barnett, Michelle K. Behaylo, Stacy J. Ettinger, Thomas H. Fine, Dean A. Pinkert and David J. Ross, Attorney–Advisers, Office of Chief Counsel for Import Administration, U.S. Department of Commerce, for defendant.

Stewart and Stewart (Terence P. Stewart and Wesley K. Caine), Washington, DC, for defendant-intervenor and plaintiff Torrington.

## OPINION

TSOUCALAS, Senior Judge:

Plaintiffs and defendant-intervenors FAG U.K. Ltd., The Barden Corporation (U.K.) Ltd., The Barden Corporation and FAG Bearings Corporation (collectively "FAG") and plaintiffs and defendant-intervenors NSK–RHP Europe Ltd. and RHP Bearings Ltd. (collectively "NSK–RHP")[1] commenced this action challenging aspects of the Final Results of the fourth antidumping administrative review of the antidumping duty orders, entitled *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, et al.; Final Results of Antidumping Duty Administrative Reviews, Partial Termination of Administrative Reviews, and Revocation in Part of Antidumping Duty Orders* ("Final Results"), 60 Fed.Reg. 10,900 (1995), as amended, *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France; Amendment to Final Results of Antidumping Duty Administrative Reviews and Recision of Partial Revocation of Antidumping Duty Order* ("Amended Final Results"), 60 Fed.Reg. 16,608 (1995). Defendant-intervenor and plaintiff, The Torrington

---

1. RHP Bearings was a United Kingdom corporation, engaged primarily in the manufacture of AFBs, that participated as an interested party to the fourth administrative review. As a result of a merger on January 1, 1994, RHP Bearings ceased to exist. NSK–RHP Europe Ltd. and RHP Bearings Ltd. became the corporate successors to RHP Bearings.

Company ("Torrington"), also challenges aspects of the fourth review.

## Background

The administrative review at issue was conducted by the Department of Commerce, International Trade Administration ("Commerce"), pursuant to section 751 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1675 (1992), and concerns antifriction bearing ("AFB") imports entered during the fourth review period, from May 1, 1992 through April 30, 1993. *Final Results,* 60 Fed.Reg. at 10,901.

On February 28, 1994, Commerce published the preliminary results of the fourth administrative review. *See Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, Germany, Italy, Japan, Singapore, Sweden, Thailand, and the United Kingdom; Preliminary Results of Antidumping Duty Administrative Reviews, Partial Termination of Administrative Reviews, and Notice of Intent To Revoke Order (in Part),* 59 Fed.Reg. 9,463 (1994). On February 28, 1995, Commerce published the Final Results at issue. *See Final Results,* 60 Fed.Reg. 10,900. After correcting the calculation of U.S. price ("USP"), Commerce published its Amended Final Results on March 31, 1995. *Amended Final Results,* 60 Fed.Reg. 16,608.

On September 13, 1995, the Court consolidated *FAG U.K. Ltd., Barden Corp. (U.K.) Ltd., The Barden Corp. and FAG Bearings Corp. v. United States,* Court No. 95–03–00335–S1, *NSK–RHP Europe, Ltd. and RHP Bearings Ltd. v. United States,* Court No. 95–04–00372 and *Torrington Co. v. United States,* Court No. 95–03–00349, into this action, Consolidated Court No. 95–03–00335–S1. Pursuant to Rule 56.2 of the Rules of this Court, FAG, NSK–RHP and Torrington move for judgment on the agency record.

FAG contends that Commerce erred in: (1) employing a rate-based, rather than amount-based, adjustment for value-added taxes; and (2) including sales of sample and prototype merchandise to U.S. customers in its margin calculation.

NSK–RHP claims that Commerce's SAS computer program: (1) improperly converted insurance costs to dollars in cases in which U.S. sales were already valued in dollars; (2) incorrectly applied value-added tax ("VAT") to the HEDGE value twice; and (3) improperly double counted the value for domestic inland freight for 1993 purchase price transactions involving the Aerospace Division of RHP.

Torrington alleges that the following actions by Commerce were unsupported by substantial evidence on the agency record and not in accordance with law: (1) taking sales below cost into account in calculating profit for constructed value; (2) resorting to constructed value where sales were made below cost without first determining whether there were other similar models that could serve as price-based comparisons; (3) adjusting foreign market value for pre-sale inland freight; (4) utilizing RHP's allocations of inventory write-offs and write-downs to all sales where record evidence established that the adjustments were product-specific or product-line specific; (5) failing to examine whether Barden's sales were made below cost despite examining whether FAG sales were made below cost, while the companies were related and were treated by Commerce as a single entity for virtually every other purpose of the review; and (6) making clerical errors.

## Discussion

The Court has jurisdiction over this matter under 19 U.S.C. § 1516a(a)(2) (1994) and 28 U.S.C. § 1581(c) (1994).

The Court must uphold Commerce's final determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)). "It is not within the Court's domain either to weigh the adequate

quality or quantity of the evidence for sufficiency or to reject a finding on grounds of a differing interpretation of the record." *Timken Co. v. United States,* 12 CIT 955, 962, 699 F.Supp. 300, 306 (1988), *aff'd,* 894 F.2d 385 (Fed.Cir.1990).

### 1. *Commerce's VAT Adjustment Methodology*

FAG challenges the VAT adjustment methodology that Commerce applied in the fourth review, arguing that Commerce should adopt a tax-neutral methodology which adds to USP the absolute amount, as opposed to the *ad valorem* rate, of VAT collected on the relevant home market sale. FAG's Mem.Supp.Mot.J. Agency R. at 7–10.

Torrington claims that, while a remand is appropriate for Commerce to review its methodology, the Court should not direct Commerce to employ a specific methodology. Torrington's Opp'n to FAG's Mot.J. Agency R. at 6–7.

Commerce has decided to return to the tax-neutral methodology that the United States Court of Appeals for the Federal Circuit ("CAFC") held was a reasonable statutory interpretation in *Federal–Mogul v. United States,* 63 F.3d 1572 (Fed.Cir.1995), and consents to a remand for this purpose. Def.'s Partial Opp'n to Pls.' Mots.J. Agency R. at 11; *see also Torrington Co. v. United States,* 20 CIT ——, ——, 944 F.Supp. 930, 936–37 (1996) (Commerce similarly consented to, and the Court granted, a remand for the same purpose). Hence, in accordance with *Federal–Mogul,* Commerce is required upon remand to implement the approved tax-neutral methodology in recalculating the adjustment to USP for FAG's dumping margins.

### 2. *Inclusion of Sales to U.S. Customers of Sample and Prototype Merchandise in Margin Calculations*

FAG contends that Commerce improperly included zero-priced or *de minimis* U.S. sales of sample and prototype merchandise in its margin calculation of USP. FAG's Mem. Supp.Mot.J. Agency R. at 11–18. FAG argues that such sales are atypical of those made in the ordinary course of business in the U.S. and, if included, unfairly distort the measure of actual dumping. *Id.* at 13–16.

In the alternative, FAG claims that if sample and prototype sales are included in Commerce's margin calculations, a circumstance of the sale ("COS") adjustment should be made to foreign market value ("FMV") to account for the inclusion of the distortive sales. *Id.* at 16–18.

Commerce responds that, although in certain circumstances it may conclude that a U.S. sample is not a sale and thus exclude it from a margin analysis, Commerce is not required to exclude zero-priced or *de minimis* sales from its analysis. Def.'s Partial Opp'n to Pls.' Mots.J. Agency R. at 12–24. Further, Commerce asserts that a COS adjustment is unnecessary where there is merely a difference in prices charged. *Id.* at 24–26. Torrington agrees generally with the positions taken by Commerce. Torrington's Opp'n to FAG's and NSK–RHP's Mots.J. Agency R. at 7–15.

■ FAG's claim is without merit. First, Commerce is not required by statute or regulation to exclude zero-priced or *de minimis* sales from its analysis. Indeed, unlike the definition of FMV, the definition of USP contains no requirement that the prices used in USP calculations be the prices charged "in the ordinary course of trade." *Compare* 19 U.S.C. § 1677a *with* 1677b(a)(1)(A) (1988); *see also Floral Trade Council of Davis, Cal. v. United States,* 15 CIT 497, 508 n. 18, 775 F.Supp. 1492, 1503 n. 18 (1991) (regular exclusion of sales not in the ordinary course of trade only occurs on the home-market side of the price comparison); *IPSCO v. United States,* 12 CIT 384, 394, 687 F.Supp. 633, 641 (1988) ("[I]f Congress intended to require the administering authority to exclude all sales made outside the 'ordinary course of trade' from its determination of United States price it could have provided for such an exclusion in the definition of United States price, as it has in the definition of foreign market value. It has not done so.").

■ Second, in determining antidumping duties, the statutory scheme compels Commerce to ascertain the USP of "*each entry* of

merchandise subject to the antidumping duty order and included within that determination...." 19 U.S.C. § 1675(a)(2)(A) (1988) (emphasis added). This Court has acknowledged in dicta that the statute does not require that absolutely every U.S. sale of merchandise under investigation be included in every case. *See American Permac, Inc. v. United States,* 16 CIT 41, 44, 783 F.Supp. 1421, 1424 (1992) ("[t]he court has a difficult time reading the 'each entry' language [in 19 U.S.C. § 1675(a)(2) ] to compel inclusion of all sales, no matter how distorting or unrepresentative"). However, Commerce can only exclude sales from USP in an administrative review in exceptional circumstances when those sales are unrepresentative and extremely distortive.[2] *See, e.g., Chang Tieh Indus. Co. v. United States,* 17 CIT 1314, 1318–19, 840 F.Supp. 141, 145–46 (1993) (exclusion of sales may be necessary to prevent a fraud on Commerce's proceedings).

■ In *Ipsco v. United States,* 13 CIT 402, 408, 714 F.Supp. 1211, 1217 (1989), the Court stated that sales should be excluded only "in those limited situations in which ITA finds that inclusion of certain sales which are clearly atypical would undermine the fairness of the comparison of foreign and U.S. sales." (Citation omitted). In essence, a sale is excluded only when its inclusion would lead to an unrepresentative price comparison, thus frustrating the "apples to apples" comparison goal of the antidumping laws. *See id.; see also U.H.F.C. Co. v. United States,* 916 F.2d 689, 697 (Fed.Cir.1990); *Smith–Corona Group v. United States,* 713 F.2d 1568, 1578 (Fed.Cir.1983), *cert. denied,* 465 U.S. 1022, 104 S.Ct. 1274, 79 L.Ed.2d 679 (1984) ("[o]ne of the goals of [determining USP under 19 U.S.C. § 1677a] is to guarantee that the administering authority makes the fair value comparison on a fair basis—comparing apples with apples"). The *Ipsco* court further noted that the "unrepresentative" standard for excluding sales from USP is stricter than the "outside the ordinary course of trade"

standard used in the FMV calculation. *Ipsco,* 13 CIT at 409, 714 F.Supp. at 1217.

■ Finally, for Commerce to disregard a sale as a sample, the respondent must establish that the sale was a true *de minimis* sample through appropriate procedures. *See, e.g., J.C. Hallman Mfg. Co. v. United States,* 13 CIT 1073, 1076, 728 F.Supp. 751, 753 (1989). Commerce inspects the following factors to decide whether an alleged sample is truly a sample: (1) whether ownership has changed hands; and (2) whether the sample was returned to the respondent, or destroyed in the testing process. *See Granular Polytetrafluoroethylene Resin from Japan; Final Results of Anti-dumping Duty Administrative Review,* 58 Fed.Reg. 50,343, 50,345 (1993). Further, because true samples are intended to be returned, they must be imported under a temporary import bond. *See J.C. Hallman,* 13 CIT at 1076, 728 F.Supp. at 753. In *J.C. Hallman,* this Court stated that

[a sample] must [be] imported under [a] temporary importation bond as prescribed by the regulations. Compliance with the pertinent regulations is mandatory. Absent proof of importation of merchandise under bond for temporary purposes, or any other persuasive evidence to the contrary, Commerce would have no way of knowing that the merchandise *is not* imported for sale.

*Id.* (citations omitted).

In this case, FAG has merely claimed that the items it labeled as samples should be excluded from the USP calculations. FAG has failed to demonstrate that these items were true samples through the court-sanctioned procedures established by Commerce and approved in *J.C. Hallman.*

FAG's alternative argument is also without merit. First, under the ITA regulations, the decision to grant a COS deduction is within Commerce's discretion. *See* 19 C.F.R. § 353.56(a)(2); *see also Böwe Passat Reinigungs–Und Wäschereitechnik GmbH v.*

---

**2.** FAG heavily relies on several cases that discuss the exclusion of certain sales from less than fair value ("LTFV") investigations. *See* FAG's Mem. Supp.Mot.J. Agency R. at 13–14. The sales information at issue, however, was collected pursuant to an administrative review, and not a LTFV investigation. While Commerce has the discretion to eliminate unusual sales from its LTFV investigations, *see* 19 C.F.R. § 353.42(b) (1994), this authority does not extend to administrative reviews which require that each entry be included. *See* 19 U.S.C. § 1675(a)(2)(A).

*United States,* 20 CIT ——, ——, 926 F.Supp. 1138, 1149 (1996).

■ Second, ITA regulations state that Commerce may make a COS adjustment to FMV when there is a *"bona fide* difference in the circumstances of the sales [and] the amount of any price differential is wholly or partly due to such difference." 19 C.F.R. § 353.56(a)(1) (1994). The regulations further require that the claimed adjustments be directly related to the sales at issue. *Id.* Differences in circumstances of sale are differences caused by expenses such as commissions, credit terms, guarantees, warranties, technical assistance and servicing. 19 C.F.R. § 353.56(a)(2). Thus, the regulations clearly require that the reason for the COS adjustment be an expense that had an *effect* on the prices charged, rather than a mere difference in the prices charged. FAG has stated only that it is entitled to a COS adjustment because the ·sample sales were zero-priced.[3]

Consequently, FAG has failed to demonstrate that the different circumstances between its sample and prototype U.S. sales and its home market sales· had an effect on the prices charged. Commerce's inclusion of the sales FAG labeled as samples for purposes of calculating USP is upheld.

3. *Conversion of Insurance Costs to Dollars in Cases in Which U.S. Sales Were Already Valued in Dollars*

NSK–RHP claims that Commerce's SAS computer program improperly converted insurance costs to dollars in cases in which U.S. sales were already valued in dollars. NSK–RHP's Mem.Supp.Mot.J. Agency R. at 5–7. In essence, NSK–RHP contends that the values it reported for insurance costs were already denominated in dollars, and so, Commerce's additional conversion to dollars artificially decreased USP. *Id.* at 6.

Upon review, Commerce agrees that its computer program improperly converted the

insurance costs to dollars and consents to a remand to correct the error. Def.'s Partial Opp'n to Pls.' Mots.J. Agency R. at 27.

After a review of the record, this Court concludes that Commerce's computer program improperly converted insurance costs that NSK–RHP already reported in dollars. Consequently, upon remand, Commerce is to correct the program so that the insurance cost values NSK–RHP reported in dollars are not further converted.

4. *Application of VAT to the HEDGE Value*

NSK–RHP also claims that Commerce's SAS computer program applied VAT to the HEDGE value twice. NSK–RHP's Mem. Supp.Mot.J. Agency R. at 7–8. Commerce acknowledges that its computer program incorrectly applied VAT to the HEDGE value twice and consents to a remand to correct the error. Def.'s Partial Opp'n to Pls.' Mots.J. Agency R. at 27.

After a review of the record, this Court concludes that Commerce's computer program improperly applied VAT to the HEDGE value twice. Consequently, upon remand, Commerce is to correct the program so that VAT is only applied to the HEDGE value once.

5. *Application of Domestic Inland Freight Value for 1993 Purchase Price Transactions Involving RHP's Aerospace Division*

NSK–RHP further claims that Commerce's SAS computer program double counts the value for domestic inland freight ("DIF") for 1993 purchase price transactions.[4] NSK–RHP's Mem.Supp.Mot.J. Agency R. at 8–9. In particular, NSK–RHP asserts that Commerce's computer program improperly applied the Aerospace Division's DIF allocation figure for May through December 1992 to the 1993 portion of the period

---

**3.** As Commerce notes, to allow for a COS adjustment under these circumstances is contrary to the purpose of the dumping law since the same argument can be made for any dumped sale. Def.'s Partial Opp'n Pls.' Mots.J. Agency R. at 25–26. *See also Final Results,* 60 Fed.Reg. at 10,947–48.

**4.** During the period of review, RHP's Aerospace Division was the sole supplier of product to purchase price customers. Def.'s App., Ex. 3, at 17.

of review. *Id.* at 8. According to NSK–RHP, the cost of production for the Aerospace Division already reflected the cost of DIF, and so, Commerce double counted the DIF charges for 1993. *Id.* at 9.

Commerce responds that no computer error occurred. Def.'s Partial Opp'n to Pls.' Mots.J. Agency R. at 27. Rather, Commerce explains that RHP failed to properly report DIF expenses for purchase price transactions for the period January 1993 through April 1993. *Id.* As a result, Commerce was forced to substitute RHP's reported DIF expenses for May through December 1992 for the missing value in order for Commerce's computer program to properly calculate USP. *Id.* at 28. Consequently, Commerce states that if a double counting of DIF occurred, it was caused by RHP's unresponsive questionnaire answer. *Id.* at 29.

Torrington, as defendant-intervenor, adds that: (1) the evidence on the record is insufficient to demonstrate that Commerce's computer program double counted RHP's DIF expenses for purchase price transactions (Torrington's Opp'n to FAG's and NSK–RHP's Mots.J. Agency R. at 17–18); (2) if the computer program did double count DIF expenses, RHP's unresponsive reporting is to blame (*id.* at 18); and (3) RHP failed to make a timely request for a correction (*id.* at 18–19).

■ As a preliminary matter, Torrington's contention that RHP failed to promptly address the alleged error is incorrect. Torrington relies on *Neuweg Fertigung GmbH v. United States*, 16 CIT 724, 797 F.Supp. 1020 (1992) for the proposition that a respondent must complain about an alleged error before the final results are released. *Neuweg*, however, is distinguishable from this case. Following the publication of the preliminary results, the respondent in *Neuweg* was put on notice that Commerce had certain difficulties with the information that respondent provided. *Id.* at 728, 797 F.Supp. at 1023. In this case, Commerce supplied no such notice. Further, NSK–RHP informed Commerce of the alleged computer error in a timely fashion: one week after the Final Results were released and before the Final Results were published.

Further, Torrington's claim that the record is inconclusive as to whether double counting occurred is without merit. During the review, Commerce instructed RHP to report its DIF expenses incident to purchase price sales for the period January through April 1993. Def.'s App., Ex. 2, at Q35. RHP blatantly failed to respond to the question directly but, rather, indicated in its Response that it included DIF costs in its costs of production.[5] *See* Def.'s App., Ex. 3.

Pursuant to 19 U.S.C. § 1677a(d)(2)(A) (1988), Commerce is to deduct DIF expenses from the purchase price.[6] To compensate for RHP's reporting failure and effectuate the language of the statute, Commerce added language to its computer program to use RHP's response for DIF during May through December 1992 for the value designated as DIF for January through April 1993. Def.'s Partial Opp'n to Pls.' Mots.J. Agency R. at 28. As a result, the computer program double counted DIF for the relevant period. The issue that remains, therefore, is whether NSK–RHP is entitled to a remand to correct double counting that occurred because of RHP's unresponsive reporting.

. . . .

(2) reduced by—

(A) except as provided in paragraph (1)(D), the amount, if any, included in such price, attributable to any additional costs, charges, and expenses, and United States import duties, incident to bringing the merchandise from the place of shipment in the country of exportation to the place of delivery in the United States.

---

5. RHP's Response stated the following:

> *Note:* Starting in January 1993, Domestic Inland Freight costs have been included in the standard costs [of production] for the Aerospace Division. Therefore, no separate breakout of this expense is reported here.
>
> Def.'s App., Ex. 3, at 18.

6. 19 U.S.C. § 1677a(d) states, in relevant part:

> (d) Adjustments to purchase price and exporter's sales price.—The purchase price and the exporter's sales price shall be adjusted by being—

■ RHP's improper reporting was the cause of the double counting and is fatal to NSK–RHP's claim. "Ultimately it is the respondent's responsibility to make sure that the ITA understands, and correctly uses, any information provided by the respondent." *Neuweg*, 16 CIT at 728, 797 F.Supp. at 1024 (citation omitted). In this case, while RHP indicated that it had included DIF for the relevant period in the amount of costs of production, it not only failed to state the relevant DIF in the appropriate place, but also failed to provide the specific amount for that DIF allocation. Had RHP provided a breakdown of the costs of production it reported, stating the amount of DIF it included, Commerce would have been able to transfer the misallocated DIF amount to the proper place in the computer program calculations.

■ While Commerce *may* request factual information at any time during a proceeding, 19 C.F.R. § 353.31(b)(1) (1994), Commerce is not required to engage in a paper war to obtain responses to questions it has already explicitly asked. *See Sugiyama Chain Co. v. United States*, 16 CIT 526, 531, 797 F.Supp. 989, 994 (1992) ("if the burden of compiling, checking, rechecking, and finding mistakes in the submission of Plaintiffs were placed upon Commerce, it would transform the administrative process into a futility"). Indeed, "[t]he Plaintiff may not control the investigation by 'selectively providing the ITA with information. . . . It is for the ITA to conduct its antidumping investigation the way it sees fit, not the way the interested party seeks to have it conducted.' ". *Comitex Knitters, Ltd. v. United States*, 16 CIT 817, 821, 803 F.Supp. 410, 414 (1992) (citations omitted). Further, the respondent must fully cooperate with Commerce and provide accurate and timely information. *See Murata Mfg. Co. v. United States*, 17 CIT 259, 265, 820 F.Supp. 603, 607 (1993). When a foreign exporter refuses, or is unable, to provide Commerce complete, timely, or accurate information, Commerce may use "the best information available" to establish dumping margins. 19 U.S.C. § 1677e(b) (1988); 19 C.F.R. § 353.37(a)(1) (1994).

■ By merely stating that it included DIF in costs of production, RHP purposefully ignored Commerce's instructions to state DIF for January through April 1993 as a questionnaire response. Consequently, Commerce was fully justified in resorting to RHP's DIF allocation for May through December 1992 to compensate for the missing response and give effect to the statutorily required calculation.

6. *Inclusion of Below–Cost Sales in the Calculation of Profit for Constructed Value*

Torrington claims that Commerce improperly included below-cost sales in its calculations of profit for use in constructed value ("CV"). Torrington's Mem.Supp.Mot.J. Agency R. at 13–22. Torrington contends that the inclusion of below-cost sales made in substantial quantities over an extended period of time distorts the statutory scheme because such sales are not in the ordinary course of trade. *Id.* at 19.

In the alternative, Torrington argues that assuming that below-cost sales should not be excluded in calculating profit, Commerce should have nevertheless recomputed profits on the basis of the sample sales reported. *Id.* at 19–22. In particular, Torrington claims that Commerce should have presumed that the sample sales reported by respondents would be representative of the profit for the general class or kind of merchandise, and so, should have computed respondents' profits based on either the sample sales reported or the average profit on all sales, whichever was greater. *Id.* at 20–21.

Commerce responds that the relevant statutes and case law support its inclusion of below-cost sales in the calculation of profit. Def.'s Partial Opp'n to Pls.' Mots.J. Agency R. at 32–33. In particular, neither the definition of CV, as stated in 19 U.S.C. § 1677b(e)(1) (1988), nor the definition of the ordinary course of trade, as stated in 19 U.S.C. § 1677(15) (1988), suggests that below-cost sales are outside the ordinary course of trade, and so, such costs should be included in the CV calculation. *Id.*

NSK–RHP agrees generally with the position taken by Commerce. NSK–RHP's

Opp'n to Torrington's Mot.J. Agency R. at 4–6. FAG also agrees generally with the position taken by Commerce, emphasizing that the definition of FMV makes no reference to the exclusion of below-cost sales from the CV profit calculation. FAG's Opp'n to Torrington's Mot.J. Agency R. at 10–24.

The statutory language supports Commerce's position. In calculating CV, Commerce includes profits for sales of merchandise of the same general class or kind in the home market, in the usual quantities and in the ordinary course of trade. *See* 19 U.S.C. § 1677b(e)(1). The statute itself does not limit the meaning of "ordinary course of trade" to sales made above cost but, rather, defines it as "the conditions and practices which ... have been normal in the trade under consideration with respect to merchandise of the same class or kind." 19 U.S.C. § 1677(15).

Further, this Court has recently concluded, in several cases, that for below-cost sales to be excluded from a CV calculation, a plaintiff must show that such sales were made outside the ordinary course of trade. *See Torrington,* 944 F.Supp. at 934–35; *Timken Co. v. United States,* 20 CIT ——, ——, 930 F.Supp. 621, 624–25 (1996); *Federal–Mogul Corp. v. United States,* 20 CIT ——, ——, 918 F.Supp. 386, 403 (1996); *Torrington Co. v. United States,* 19 CIT ——, ——, 881 F.Supp. 622, 633 (1995).

■ In this case, Torrington has claimed that merely because the sales are below cost and are made in substantial quantities over an extended period of time, they are outside of the ordinary course of trade. Torrington has not demonstrated that the below-cost sales at issue are actually outside of the ordinary course of trade. Consequently, as this Court has decided several times before, Commerce did not improperly include below-cost sales in calculating profit for CV purposes, and the inclusion of below-cost sales did not distort the statutory scheme.

This Court has also addressed Torrington's alternative argument and has concluded that it is without merit. In *Federal–Mogul,* the Court stated that 19 U.S.C. § 1677f–1 (1988)[7] explicitly grants Commerce the authority to select appropriate samples for determining USP and FMV, as long as the samples are "representative" of the transactions under investigation. 20 CIT at ——, 918 F.Supp. at 403; *see also Torrington,* 944 F.Supp. at 935. The Court further noted, however, that because Commerce has such broad discretion in its sample selection methodology, Commerce should also have discretion not to use samples at all. *Id.* at ——, 918 F.Supp. at 404.[8]

In this case, as in *Federal–Mogul,* Commerce did not believe that the profit on the sale of such or similar merchandise could be presumed to be representative of the profit for the general class or kind of merchandise. *Final Results,* 60 Fed.Reg. at 10,923. Under this Court's rationale in *Federal–Mogul,* Commerce's decision not to rely on the reported samples for calculating CV is reasonable and in accordance with law.

### 7. Use of CV to Calculate FMV for AFBs Sold Below Cost

Torrington also claims that Commerce resorted prematurely to CV during its FMV calculation. Torrington's Mem.Supp.Mot.J. Agency R. at 22–27. Specifically, Torrington contends that after finding that the most similar home market model was sold below cost in 90 percent of the home market sales, and over an extended period of time, Commerce resorted to CV without first determining whether there were any other similar models that could have served as price-based comparisons. *Id.* Torrington argues that

---

**7.** 19 U.S.C. § 1677f–1 explicitly states that Commerce *may* use sampling techniques, and that *[t]he authority to select appropriate samples and averages shall rest exclusively with the administering authority; but such samples and averages shall be representative of the transactions under investigation.*
(Emphasis added).

**8.** It is clear from the legislative history that section 1677f–1 does not require Commerce to use sampling but, rather, permits Commerce to use sampling when necessary. *See Torrington,* 944 F.Supp. at 935 n. 2 (citing H.R.Rep. No. 725, 98th Cong., 2d Sess. 46 (1984), *reprinted in* 1984 U.S.C.C.A.N. 5127, 5173).

there is a strong statutory preference for calculating FMV based on home market sales, rather than on CV. *Id.* at 23.

Commerce responds that 19 U.S.C. § 1677b(b) (1988) directs it to resort immediately to CV once Commerce finds and disregards all home market sales of "matching" merchandise. Def.'s Partial Opp'n to Pls.' Mots.J. Agency R. at 40–47. FAG agrees with the position taken by Commerce. FAG's Opp'n to Torrington's Mot.J. Agency R. at 25–30.

▆▆▆▆ This Court recently addressed this issue and concluded that Commerce's methodology was reasonable. *See Federal–Mogul,* 20 CIT at ——, 918 F.Supp. at 394–97; *see also Torrington,* 944 F.Supp. at 936. To determine the amount of antidumping duties to be assessed on a particular entry of merchandise, Commerce is to compare the merchandise sold in the United States with "such or similar" merchandise, as defined by 19 U.S.C. § 1677(16), sold in the home country or to a third country. *See Federal–Mogul,* 20 CIT at ——, 918 F.Supp. at 395. Under its current methodology, Commerce disregards all home market sales and immediately resorts to CV if more than 90 percent of home market sales of the model were made below cost over an extended period of time, and are not at prices that permit recovery of all costs within a reasonable period of time in the ordinary course of trade. *See Final Results,* 60 Fed.Reg. at 10,935–36.

As this Court decided in *Federal–Mogul* and *Torrington,* Commerce is not required to investigate whether it can make another match based on the next most similar merchandise before resorting to CV. *See Federal–Mogul,* 20 CIT at ——, 918 F.Supp. at 396; *Torrington,* 944 F.Supp. at 936. Indeed, the statutory language *requires* Commerce to resort to CV when sales are disregarded. *See* 19 U.S.C. § 1677b(b); *see also Zenith Elecs. Corp. v. United States,* 18 CIT 1145, ——, 872 F.Supp. 992, 998–1000 (1994) (rejecting the argument that Commerce should use the actual prices of merchandise, rather than resort to CV, if any merchandise meeting one of the definitions of "such or

similar merchandise" survives the cost of production test under 19 U.S.C. § 1677b(b)).

In this case, Commerce matched certain AFB models sold to the United States with identical AFB models sold in the home market. *See Final Results,* 60 Fed.Reg. at 10,935–36. After an investigation, Commerce concluded that the model AFBs were inadequate under 19 U.S.C. § 1677b(b), and so, Commerce used CV to determine FMV. *See id.* Commerce was not required to use the price of the next most similar merchandise. This methodology was upheld in *Federal–Mogul* and *Torrington* and is fully in accordance with law.

### 8. *Adjustment of FMV for Pre–Sale Inland Freight*

In its *Final Results,* Commerce adjusted FMV for home market pre-sale inland freight. 60 Fed.Reg. at 10,941–42. Torrington claims that this deduction for pre-sale inland freight expenses is contrary to law. Torrington's Mem.Supp.Mot.J. Agency R. at 27–29.

Commerce contends that its FMV adjustment for pre-sale inland freight is reasonable and has been previously upheld by this Court, as well as the CAFC. Def.'s Partial Opp'n to Pls.' Mots.J. Agency R. at 47–48. FAG agrees generally with the position taken by Commerce. FAG's Opp'n to Torrington's Mot.J. Agency R. at 30–33.

▆▆▆▆ When Commerce uses exporter's sales price to determine USP, it must adjust FMV by deducting indirect selling expenses. *See* 19 C.F.R. § 353.56(b)(2) (1994). In *Torrington Co. v. United States,* 68 F.3d 1347, 1356 (Fed.Cir.1995), the CAFC held that, pursuant to the rationale of *Smith–Corona Group,* 713 F.2d at 1579, it was reasonable for Commerce to deduct indirect selling expenses, such as indirect transportation expenses, from FMV. *See also Torrington,* 944 F.Supp. at 936; *Timken,* 20 CIT at ——, 930 F.Supp. at 626–27. Hence, Commerce's adjustment of FMV for home market pre-sale freight expenses is sustained.

9. *Acceptance of RHP's Allocations of Inventory Write-offs and Write-downs*

■ Torrington also claims that Commerce erred in accepting RHP's allocations of inventory write-offs and write-downs for all sales during the period of review. Torrington's Mem.Supp.Mot.J. Agency R. at 29–30. In particular, Torrington contends that write-offs and write-downs are model specific in their nature, and so, the costs should be charged to the models involved. *Id.* Because RHP charged its inventory write-offs and write-downs to all company stock, as opposed to the particular models involved, the write-offs and write-downs for merchandise within the scope of the antidumping duty orders may have been charged partially to merchandise outside the scope of the antidumping duty orders, and vice versa. *Id.* at 30. Hence, Torrington asserts that Commerce should have reallocated these costs to the bearing model with the highest sales revenue in the United States during the period of review. *Id.*

Commerce responds that it properly accepted RHP's write-offs and write-downs because RHP's methodology was reasonable and in accordance with law. Def.'s Partial Opp'n to Pls.' Mots.J. Agency R. at 48–51. NSK–RHP agrees with the position taken by Commerce. NSK–RHP's Opp'n to Torrington's Mot.J. Agency R. at 6–7.

Commerce adheres to a firm's recording of costs if they are reported in accordance with the generally accepted accounting principles ("GAAP") of the firm's home country, so long as Commerce is satisfied that such principles reasonably reflect the costs of producing the merchandise. *See, e.g., Final Determination of Sales at Less Than Fair Value: Furfuryl Alcohol From South Africa,* 60 Fed.Reg. 22,-550, 22,556 (1995).

In this case, RHP reported its inventory write-offs and write-downs during the period of review by carrying forward a balance against all classes of stock, hence creating a reserve. *See Final Results,* 60 Fed.Reg. at 10,925. RHP then charged its write-offs and write-downs against this reserve. *See id.* Commerce accepted RHP's methodology of accounting for inventory write-offs and write-downs, finding that it was in accordance with

the United Kingdom's GAAP and reasonably reflected the costs incurred in the production of the merchandise. *Id.*

Commerce's reliance on an individual firm's home country GAAP provides an objective standard by which to measure costs, and allows a respondent a predictable basis on which to compute the costs. Further, this Court has consistently upheld Commerce's reliance on a firm's expenses as recorded in the firm's financial statements, as long as those statements were prepared in accordance with the home country's GAAP and do not significantly distort the firm's actual costs. *See, e.g., CEMEX, S.A. v. United States,* 19 CIT ——, ——, Slip Op. 95–72, at 19, 1995 WL 251561 (Apr. 24, 1995); *NTN Bearing Corp. Of America v. United States,* 17 CIT 713, 720, 826 F.Supp. 1435, 1441 (1993); *see also* H.R.Rep. No. 571, 93d Cong., 1st Sess. 71 (1973) ("[I]n determining whether merchandise has been sold at less than cost, [Commerce] will employ accounting principles generally accepted in the home market of the country of exportation if [Commerce] is satisfied that such principles reasonably reflect the variable and fixed costs of producing the merchandise"). Consequently, in this case, Commerce appropriately relied on RHP's recording of write-offs and write-downs, as they were recorded in accordance with the United Kingdom's GAAP and did not distort RHP's actual costs.

The Court concludes that Commerce's acceptance of RHP's method for accounting of its write-offs and write-downs was reasonable and in accordance with law. Further, any reallocation of costs to the bearing model with the highest sales revenue, as Torrington suggests, would artificially and unnecessarily inflate RHP's production costs.

10. *Decision Not to Investigate Whether Barden's AFBs Were Sold Below Cost*

■ In addition, Torrington contends that Commerce erred in failing to examine whether Barden's home market sales were below cost. Torrington's Mem.Supp.Mot.J. Agency R. at 31–32. Torrington argues that, because FAG U.K. and Barden are related companies, and because Commerce treated

them as a single entity for virtually every other purpose of the administrative review, Commerce should have examined Barden's sales as well as FAG U.K.'s sales. *Id.* at 31. Torrington supports this claim by noting that Commerce has previously collapsed affiliated companies, including FAG U.K. and Barden U.K. for purposes of the third antidumping investigation. *Id.*

Commerce responds that it did not conduct an investigation of Barden's home market sales because there had been no allegation that Barden had made below-cost sales, and because there were no sales by FAG U.K. of AFBs produced by Barden or sales by Barden of AFBs comparable to those resold by FAG U.K. Def.'s Partial Opp'n to Pls.' Mots.J. Agency R. at 51–58.

Further, Commerce decided to conduct a below-cost investigation of FAG U.K.'s home market sales because Commerce had found during the third review period that FAG U.K. had made sales below cost of products produced by an unrelated company. *Id.* at 54 (citing *Final Results*, 60 Fed.Reg. at 10,-928). In contrast, Commerce states that it had reviewed Barden's sales in each of the previous antidumping reviews but had not found that Barden's AFBs were sold at be-low-cost. *Id.* Also, Barden's home market sales involved exclusively self-produced merchandise. *Id.* Hence, Commerce concludes that there was no reason to conduct an investigation on Barden's home market sales.

FAG agrees generally with the position taken by Commerce, emphasizing that, despite their affiliation, FAG U.K. and Barden were always separate and distinct companies and that below cost allegations must be company-specific and product-specific. FAG's Opp'n to Torrington's Mot.J. Agency R. 33–42.

Before conducting a below-cost investigation, Commerce is required to have "reasonable grounds to believe or suspect that sales in the home market of the country of exportation ... have been made at [below cost]." 19 U.S.C. § 1677b(b); *see also* 19 C.F.R. § 353.51(a) (1994). "Reasonable grounds" has been defined as "a *specific* and *objective* basis for suspecting that a *particular* foreign firm is engaged in home market sales at

prices below its cost of production...." *Al Tech Specialty Steel Corp. v. United States*, 6 CIT 245, 250, 575 F.Supp. 1277, 1282 (1983), *aff'd*, 745 F.2d 632 (Fed.Cir.1984). Commerce has also found reasonable grounds to exist in situations where a sufficient allegation of below-cost sales was made in the current administrative review and where the previous administrative proceeding resulted in an affirmative determination of below-cost sales. *See, e.g., Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From Japan; Preliminary Results of Antidumping Duty Administrative Reviews and Partial Termination of Administrative Reviews*, 57 Fed.Reg. 10,868, 10,870 (1992).

In this case, there has been no allegation that Barden sold its AFBs at below cost during the fourth review period. Further, Commerce has not previously found that Barden made below-cost home market sales.

In addition, FAG U.K.'s below-cost sales during the third period of review do not constitute "reasonable grounds to believe or suspect" that Barden sold AFBs at below cost during the fourth review period for the following reasons. First, the allegation and finding of below-cost sales during the third review period involved solely AFBs produced by an unrelated party. *Final Results*, 60 Fed.Reg. at 10,928. Second, FAG U.K.'s and Barden's products were not connected in any way because Barden only sold its own AFBs and did not sell to or through FAG U.K., while FAG U.K. only resold AFBs produced by the unrelated producer. *Id.*

Consequently, Commerce's conclusion that reasonable grounds for an investigation did not exist is sustained and Commerce's decision not to investigate Barden's home market sales to determine whether they were made below cost is fully in accordance with law.

### 11. *Clerical Errors for FAG/Barden*

Torrington alleges that Commerce made a clerical error in the Final Results regarding FAG/Barden U.S. sales. Torrington's Mem. Supp.Mot.J. Agency R. at 32–33. Commerce agrees that a clerical error was committed and consents to a remand to correct the

error. After review of the record, the Court finds that a clerical error was made with respect to FAG/Barden U.S. sales and upon remand, Commerce is to correct this error.

### Conclusion

In accordance with the foregoing opinion, this case is remanded to Commerce to allow it to: (1) utilize the approved tax-neutral methodology for adjusting for VAT; (2) correct the clerical error of the conversion of insurance costs to dollars in cases in which the U.S. sales were already valued in dollars; (3) correct the clerical error in the application of VAT to the HEDGE value; and (4) correct the clerical error with respect to FAG/Barden U.S. sales. The Final Results are sustained as to all other issues raised by FAG, NSK–RHP, and Torrington.

### *ORDER*

This case having been duly submitted for a decision and the Court, after due deliberation, having rendered a decision herein; now, in accordance with said decision, it is hereby

**ORDERED** that this case be remanded to the Department of Commerce, International Trade Administration ("Commerce"), to utilize the tax-neutral methodology for adjusting for value-added taxes approved by *Federal–Mogul Corp. v. United States,* 63 F.3d 1572 (Fed.Cir.1995); and it is further

**ORDERED** that Commerce correct the clerical error of the conversion of insurance costs to dollars in cases in which the U.S. sales were already valued in dollars; and it is further

**ORDERED** that Commerce correct the clerical error in the application of value-added tax to the HEDGE value; and it is further

**ORDERED** that Commerce correct the clerical error with respect to FAG/Barden U.S. sales; and it is further

**ORDERED** that Commerce's determination is affirmed in all other respects; and it is further

**ORDERED** that the remand results are due within ninety (90) days of the date that this opinion is entered. Any comments or responses by the parties to the remand results are due within thirty (30) days thereafter. Any rebuttal comments are due within fifteen (15) days of the date that the responses or comments are due.