**Slip Op. 09-126**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| AD HOC SHRIMP TRADE ACTION COMMITTEE, | |
| Plaintiff, | Before: Richard W. Goldberg, Senior Judge |
| v. | Court No. 08-00229 |
| UNITED STATES, | |
| Defendant, | PUBLIC VERSION |
| and | |
| OCEANINVEST, S.A., | |
| Defendant-Intervenor. | |

**OPINION**

[Commerce's final antidumping duty administrative review determination is sustained.]

Dated: October 30, 2009

Picard, Kentz & Rowe, LLP (Andrew W. Kentz and Nathaniel Maandig Rickard) for Plaintiff Ad Hoc Shrimp Trade Action Committee.

Michael F. Hertz, Assistant Attorney General; Jeanne E. Davidson, Director, Patricia A. McCarthy, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (Stephen C. Tosini); Office of the Chief Counsel for Import Administration, U.S. Department of Commerce (Nithya Nagarajan), Of Counsel, for Defendant United States.

Akin Gump Strauss Hauer & Feld, LLP (Warren E. Connelly, and Jarrod M. Goldfeder) for Defendant-Intervenor OceanInvest S.A.

GOLDBERG, Senior Judge:  Plaintiff Ad Hoc Shrimp Trade Action Committee ("Ad Hoc Shrimp") is a domestic association of producers and processors of warmwater shrimp.  In this action, Ad Hoc Shrimp contests certain aspects of the administrative determination issued by the International Trade Administration of the United States Department of Commerce ("Commerce") in the second administrative review of the antidumping duty order covering certain frozen warmwater shrimp from Ecuador.  See Certain Frozen Warmwater Shrimp from Ecuador: Final Results and Partial Rescission of Antidumping Duty Administrative Reviews, 73 Fed. Reg. 39,945 (Dep't Commerce July 11, 2008) ("Final Results").  Ad Hoc Shrimp alleges that Commerce erroneously accepted the raw material cost information for shrimp products reported by Defendant-Intervenor OceanInvest S.A. ("OceanInvest").  Accordingly, Ad Hoc Shrimp claims that Commerce's Final Results are unsupported by substantial evidence on the record and otherwise not in accordance with the law. Commerce supports its determination to rely upon OceanInvest's reported costs in the Final Results because those costs reflect the actual costs associated with the production of shrimp products and because Commerce did not depart from past practice. For the reasons that follow, the court sustains Commerce's determinations and denies Plaintiff's motion for judgment on the agency record to remand the Final Results to Commerce.

## I.    JURISDICTION AND STANDARD OF REVIEW

The Court has jurisdiction over this matter pursuant to section 516a(a)(2)(B)(iii) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii) (2006), and 28 U.S.C. § 1581(c) (2006).

For administrative reviews of antidumping orders, the Court sustains Commerce's determinations, findings, or conclusions unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Universal Camera Corp. v. NLRB, 340 U.S. 474, 477 (1951).  When a party alleges that Commerce's action is not supported by substantial evidence, the Court assesses whether the agency action is "unreasonable" given the record as a whole.  Nippon Steel Corp v. United States, 458 F.3d 1345, 1350-51 (Fed. Cir. 2006).  "[T]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence."  Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966) (citing NLRB v. Nevada Consol. Copper Corp., 316 U.S. 105, 106 (1942)).  The Court need only find evidence "which could reasonably lead" to the conclusion drawn by Commerce, thus

making it a "rational decision."  Matsushita Elec. Indus. Co.,

v. United States, 750 F.2d 927, 933 (Fed. Cir. 1984).

## II.   STATEMENT OF THE FACTS

OceanInvest produces finished, i.e. "value-added", shrimp

products from raw shrimp delivered by farmers to OceanInvest's

processing facility in Ecuador.  The production process includes

classifying shrimp based upon its size.  The size of shrimp,

referred to as the count size, is expressed in terms of the

number of individual shrimp contained in a unit of weight.  For

example, a count size of 51/60 headless shrimp indicates one

pound of shrimp that contains 51 to 60 individual headless

shrimp.  Individual shrimp may vary in size within the count

size classification for a value-added shrimp product.

OceanInvest pays a higher price for larger shrimp.  For

instance, OceanInvest pays more for 51/60 count size than 61/70

count size because the latter contains smaller shrimp.

In February 2007, at Ad Hoc Shrimp's request, Commerce

initiated a sales-below-cost investigation against OceanInvest.

The investigation focused on OceanInvest's sales of frozen

warmwater shrimp in the United States during the period of

review ("POR") from February 1, 2006 to January 31, 2007.  Over

the course of the administrative review, Commerce sent

OceanInvest three sets of supplemental questionnaires inquiring

into its cost of production ("COP") reporting.  On March 6,

2008, Commerce published the preliminary results of its administrative review. Certain Frozen Warmwater Shrimp from Ecuador, 73 Fed. Reg. 12,115 (Dep't Commerce Mar. 6, 2008) (preliminary results). In its analysis, Commerce utilized OceanInvest's reported costs of raw material inputs.

Ad Hoc Shrimp filed a brief contending that Commerce should reject OceanInvest's reported costs of raw material inputs as distortive. After evaluating the information and explanations provided by OceanInvest, Commerce disagreed with Ad Hoc Shrimp and accepted OceanInvest's reported costs in the Final Results. Decision Memorandum, A-331-802, ARP 06-07, Admin. R. Pub. Doc 165 (July 3, 2008) available at http://ia.ita.doc.gov/frn/ summary/ECUADOR/E8-15830-1.pdf (last visited October 14, 2009) ("Decision Mem."). Commerce determined that the reported cost information was consistent with OceanInvest's normal accounting records and reasonably reflected the costs associated with the production and sale of the merchandise. Id. at 11.

Ad Hoc Shrimp then filed this action against Commerce under 28 U.S.C. § 1581(c). This Court allowed OceanInvest to intervene.

### III. DISCUSSION

Ad Hoc Shrimp raises two arguments to support its claim that the Final Results are unsupported by substantial evidence on the record or otherwise not in accordance with law. First,

it alleges that Commerce unreasonably accepted OceanInvest's reported raw material input costs for value-added products despite the fact that those costs are unreliable and reflect a physical impossibility.  Second, Ad Hoc Shrimp argues that Commerce's acceptance of OceanInvest's [          ] raw material costs for virtually identical value-added products is an unexplained and unsupported departure from Commerce's past practice.  The court addresses each argument in turn.

**A. Commerce's determination that OceanInvest's reported raw material cost information reasonably reflects its actual production costs is supported by substantial evidence and otherwise in accordance with the law.**

When considering the imposition of an antidumping duty, cost of production:

> "shall normally be calculated based upon the records of the exporter or producer of the merchandise, if such records are kept in accordance with the generally accepted accounting principles of the exporting country…and reasonably reflect the costs associated with the production and sale of the merchandise."

19 U.S.C. § 1677b(f)(1)(A).  Ad Hoc Shrimp does not dispute whether OceanInvest's records were kept in accordance with Ecuadorian generally accepted accounting principles ("GAAP").  Rather, Ad Hoc Shrimp claims that Commerce's acceptance of OceanInvest's reported raw material costs was not reasonable under section 773(f)(1)(A) of the Tariff Act, 19 U.S.C. § 1677b(f)(1)(A) because those costs reflected a production process that was physically impossible and unreliable.

Specifically, Ad Hoc Shrimp argues that OceanInvest's

explanation of its cost methodology is facially implausible

because it [

                              ] [1]  Ad Hoc Shrimp points to record

evidence for one shrimp product, as identified by the product's

control number (CONNUM), that suggests that the finished shrimp

product produced does not appear attainable based on the raw

material shrimp size used.  See Decision Mem. at 8.  However, Ad

Hoc Shrimp fails to take into account several important factors

underlying OceanInvest's production process and accounting

system.

     First, OceanInvest explained that a mix of raw shrimp

inputs, including smaller input size shrimp, can be used to

produce a larger peeled product.  For example, a combination of

51/60 count size and 61/70 count size raw shrimp can be used to

produce a 51/60 count size peeled shrimp product.  See Letter

from Cameron & Hornbostel LLP to U.S. Department of Commerce,

Case No. A-331-802, Admin R. Pub. Doc. 152, Non-Pub. Doc. 50, at

1-2 (Mar. 11, 2008) (third supplemental section D response)

---

[1] Ad hoc explains that removing the shell necessarily reduces,
not increase, the weight of the raw material.  Therefore, Ad Hoc
Shrimp asserts that even if all of the shell-on raw material
OceanInvest listed as being [                           ] were in
fact [                                      ], it would still
be impossible to produce a peeled product weighing [
      ] per piece as OceanInvest reported.

("Third Supplemental Section D Response").[2]  The resulting mix would be classified as a 51/60 finished product despite the presence of individual shrimp of varying count size.[3]  It is the total number of shrimp in the finished product, not the size of each individual shrimp, that determines the marked count size of the product.

The record evidence demonstrates that OceanInvest used different mixes of raw input shrimp count sizes to produce finished products that satisfied its customers' size specifications.  See, e.g., Admin. R. Non-Pub. Doc. 34 (first supplemental section D response).  During its investigation, Commerce reviewed OceanInvest's inventory tracking system and found that OceanInvest tracks the actual mix of shrimp input sizes that are used to produce each peeled product.  Decision Mem. at 10.  This system tracked both the input shrimp size and cost on an actual, as invoiced basis, to ensure that the final recorded costs accurately reflected the prices paid for the inputs.  Id. at 10-11.

---

[2] Further references to OceanInvest's supplemental questionnaire responses are cited to the administrative record.

[3] OceanInvest elaborates that a processor could mix 51 count size and 65 count size shrimp on a 50/50 basis and produce a one pound box containing 59 shrimp.  In an extreme example, a shrimp processor could use 90% 61 count peeled shrimp and 10% 51 count peeled shrimp and still produce an average count size of less than 60, which falls within the specified 51/60 range.

Moreover, Ad Hoc Shrimp's "disappearing shrimp" argument is without merit.  Ad Hoc Shrimp claims that OceanInvest failed to explain how shrimp allegedly disappeared in the production process.[4]  Thus, the total number of shrimp reported by OceanInvest, according to Ad Hoc Shrimp, does not reasonably reflect the costs associated with its production.  However, OceanInvest explained that it was reporting the equivalent yield of shrimp after the production process.  When the shell is peeled from the shrimp, the difference between the weight of the shrimp before and after peeling is referred to as the "yield." The reported "yield" for the control number at issue was [        ] which meant that the total weight after peeling was [        ] of the total weight before peeling.  In other words, OceanInvest was stating that, at the end of the production process, it had the equivalent yield of [            ] individual shrimp, not that it had lost individual shrimp during the course of the production.[5]

Ad Hoc Shrimp also misinterprets the ramifications of the "purchasing strategy" disclosed by OceanInvest.  OceanInvest

---

[4] This claim focuses on OceanInvest's questionnaire response that suggests that the company started the production process with [        ] shrimp but ended up with only [        ] shrimp. Third Supplemental Section D Response at 2-3.
[5] As OceanInvest explains, [
            ]  Commerce did not understand OceanInvest to say that [          ] individual shrimp before peeling are literally equal to [                          ] after peeling.

explained to Commerce that, from time to time, it employs a

purchasing strategy whereby it [

                                                    ]  Third

Supplemental Section D Response at 1, 3.  Under this purchasing

strategy, OceanInvest will [

                                                    ]  See Cost of

Production and Constructed Value Calculation Adjustments for the

Final Results, A-331-802, ARP 06-07, Admin. R. Pub. Doc. 167,

Non-Pub. Doc. 59 (July 3, 2008) ("COP Mem., Admin. R. Non-Pub.

Doc. 59").  In other words, OceanInvest will [


            ]  OceanInvest then classifies and records the

purchased shrimp [                        ] and they pay the supplier

[                ] price for the shrimp.  Id.  For the particular

control number at issue, OceanInvest explained that it had

engaged in this purchasing strategy [


            ]  Third Supplemental Section D Response at 3-4.

Ad Hoc Shrimp does not assert that this purchasing strategy

violates any statute or regulation governing the calculation of

OceanInvest's raw shrimp costs.  Instead, Ad Hoc Shrimp argues

that the conduct of these transactions renders OceanInvest's

reporting inaccurate because [

                                                    ]  Ad Hoc Shrimp

argues that this purchasing practice calls into question the
rest of OceanInvest's reported costs.

While Ad Hoc Shrimp asserts that OceanInvest [

], Commerce
found that the costs are not distortive.  Pursuant to the Tariff
Act, the producer must report to Commerce the actual price paid
for raw shrimp, 19.U.S.C. §§ 1677b(e) and (f), which Commerce
found had occurred in this case.  Decision Mem. at 11.  In
addition, Commerce noted that this purchasing practice is
infrequent and represents only a small percentage of
OceanInvest's overall raw material purchases.[6]  Id.  When it did
happen, OceanInvest recorded in its accounting system [


]  COP Mem., Admin. R. Non-Pub. Doc.
59.  OceanInvest calculated the actual invoice cost of the raw
shrimp in their normal books and records which they used to
compute their reported costs to Commerce.  Id.  Commerce thereby
determined that the costs captured in the reported costs

---

[6] Commerce explained that the record evidence demonstrates that
this purchasing practice affected [                            ].
Admin. R. Non-Pub. Doc. 34 at Ex. SD-11; Admin. R. Non-Pub. Doc.
42 at Ex. 2SD-6.  These [                    ] represent only
[     ] percent of the [   ] individual reported peeled control
numbers, and further, peeled products as a whole account for
only [    ] percent of total shrimp production for OceanInvest
during the period of review.  Def.'s Br. at 9.

reflected OceanInvest's actual costs incurred for its raw material shrimp inputs, Decision Mem. at 11, [




]

Simply because Ad Hoc Shrimp argues that this "purchasing strategy" is not a reasonable explanation for OceanInvest's reported information does not prevent Commerce's determination from being supported by substantial evidence.  See Catfish Farmers of America v. United States, Slip Op. 09-96, 2009 WL 2921300 (CIT Sep. 14, 2009) ("The administrative record for an antidumping duty administrative review may support two or more reasonable, though inconsistent, determinations on a given issue.")  As part of its investigative process, Commerce specifically requested a deeper explanation of the reported costs for the control number at issue.  Commerce reviewed how OceanInvest reflected its payments to the farmers in its raw material inventory system.  COP Mem., Admin. R. Non-Pub. Doc. 59.  It then reviewed how the costs in that system flowed in the calculations contained in the questionnaire responses on COP reporting that OceanInvest filed with Commerce.  Id.  Commerce analyzed OceanInvest's reported costs taking into consideration OceanInvest's inventory tracking system, cost methodology, and questionnaire responses explaining this purchasing strategy.  Commerce thereby determined that the infrequent use of this

purchasing practice did not invalidate the accuracy of OceanInvest's material costs.  Decision Mem. at 10-11.  Based on the record evidence, Commerce reasonably concluded that this purchasing strategy, in light of OceanInvest's reported information and supplemental responses, was a reasonable explanation for OceanInvest's reported costs.

Ad Hoc Shrimp also claims that Commerce's determination in the Final Results is not reasonable under section 773(f)(1)(A) of the Tariff Act, 19 U.S.C. § 1677b(f)(1)(A) because agency practice requires accurate product-specific costs in addition to accurate aggregate costs.  Pl.'s Br. 10 (citing Certain Preserved Mushroom from Indonesia, 63 Fed. Reg. 72,268, 72,276 (Dep't Commerce Dec. 31, 1998) ("The fact that the inaccurate standards for each major cost element add up to a total that is closer to the actual total costs does not support the claim that individual standard costs are reliable.")).  This argument reiterates Ad Hoc Shrimp's previous argument regarding [                                                                    ] because Ad Hoc Shrimp frames the issue not as whether OceanInvest's costs reported were accurate, but instead focuses on the reported count size information.  It alleges Commerce unreasonably accepted product-specific raw material count size information [                                                                    ]

However, the record indicates that Commerce did not accept
OceanInvest's reported costs only because they were reported
accurately on an aggregate basis.  OceanInvest followed
Commerce's normal practice and reported the model-specific
average shrimp costs incurred during the period of review for
each category of products.  See Decision Mem. at 10.  Moreover,
OceanInvest [                                                    ]
Commerce understood how OceanInvest recorded raw material costs
and sizes in its accounting system.  Commerce concluded that it
is reasonable to accept OceanInvest's explanation that different
raw shrimp inputs could produce "value-added products of the
same finished count size although a POR average cost is used for
each raw shrimp input in calculating production costs."  Id.

In summary, Commerce's determination that OceanInvest's
reported raw material cost information for value-added products
reasonably reflects its actual production costs is supported by
substantial evidence and is in accordance with the law.
Pursuant to section 773(f)(1)(A) of the Tariff Act, 19.U.S.C. §
1677b(f)(1)(A), Commerce relied on OceanInvest's recorded
information because it was kept in accordance with the home
country GAAP.  This Court has consistently upheld Commerce's
reliance on a company's costs as recorded in its financial
statements "as long as those statements were prepared in
accordance with the home country's GAAP and do not significantly

distort the firm's actual costs." <u>Solvay Solexis S.P.A. v. U.S</u>, 628 F.Supp.2d 1375, 1379 (CIT 2009); <u>see also</u> <u>Cinsa, S.A. de C.V. v. United States</u>, 21 CIT 341, 343, 966 F.Supp. 1230, 1235 (1997); <u>FAG U.K. Ltd. V. United States</u>, 20 CIT 1277, 1290, 945 F.Supp. 260, 271 (1996).  Ad Hoc Shrimp fails to demonstrate that the reported costs are significantly distorted.  Commerce gained an understanding of how OceanInvest uses mixtures of different count sizes of raw material to produce the same finished products.  It also found that OceanInvest's inventory system tracks the specific mix of actual shrimp inputs for each finished product.  Moreover, Commerce understood that, in rare instances, OceanInvest used raw material that it recorded as [                                                          ] and found that OceanInvest reported the actual prices it paid.  Based upon the record evidence, Commerce reasonably determined that OceanInvest reported the actual raw material costs needed to produce the value-added products and that these costs were not distortive.

   **B. Commerce's acceptance of OceanInvest's different raw material costs for similar value-added products is not inconsistent with the Agency's practice.**

   Ad Hoc Shrimp argues that Commerce erroneously accepted [        ] raw material costs for virtually identical finished shrimp products in violation of Commerce's settled practice. Specifically, Ad Hoc Shrimp indicates that, for two sets of control numbers, OceanInvest reported different raw material

count sizes [                                          ] for the same

peeled shrimp products differing only in terms of container

weight or presentation, two physical characteristics that Ad Hoc

Shrimp alleges have no bearing on raw material costs.  Ad Hoc

Shrimp asserts that, under established practice, identical

products must have identical costs reported for them.

    Under Commerce's methodology, OceanInvest must calculate

its COP on a control number-specific basis.  The control number

identifies a shrimp product by the physical characteristics that

Commerce determines can have a material effect on product prices

and costs.[7]  In the shrimp investigations, Commerce identified 14

distinct physical characteristics, including container weight

and presentation, that could have such an effect.  Thus, under

Commerce's methodology, if the container weight or presentation

differs, the control number differs.  Each product that has a

different control number is a different product for cost

calculation purposes, no matter how physically similar those

products may be as a practical matter.

    The products at issue do not "share the same physical

characteristics" as defined by Commerce because they differ in

container weight or presentation.  Accordingly, they are not

identical products and do not require identical material costs.

---

[7] Different physical characteristics include form (raw or cooked), head status (head-on or headless), count size, and shell status (shell-on or peeled).

The record indicates that different mixes of shrimp count sizes as inputs can produce the same value-added product that differ only in container sizes or presentations.  See, e.g., Admin. R. Non-Pub. Doc. 42 (second supplemental section D response). Therefore, Commerce's methodology permits different raw material count size and cost information for shrimp products differing only in their container size or their presentation.

Moreover, the court is not convinced that Commerce's acceptance of OceanInvest's different raw material costs for certain shrimp products differing only in container weight or presentation deviates from past practice.  Ad Hoc Shrimp argues that Commerce deviated from its past practice by accepting OceanInvest's reported raw material costs in the second administrative review even though the costs suffer from the same deficiency as the costs that Commerce rejected in the first administrative review.  See Certain Frozen Warmwater Shrimp from Ecuador: Final Results of Antidumping Duty Administrative Review, 72 FR 52070 (Dep't Commerce Sept. 12, 2007) (first administrative review).  However, Commerce's refusal to accept OceanInvest's raw material costs in the first administrative review concerned separate issues.  In the first administrative review, Commerce determined that OceanInvest had made errors in calculating its raw shrimp costs which OceanInvest then corrected.  See Decision Memorandum, A-331-802, AR 04-06 (Sep. 5

2007), available at 2007 WL 2773557 (issues and decision memorandum to first administrative review).  OceanInvest had reported its costs based on finished shrimp count size rather than input shrimp count size.  Id. at cmt. 6.  It also incorrectly reported the last purchase price in the month in which a shrimp product was actually produced rather than calculate the weighted average cost of raw material that it purchased in the entire POR.  Id.  In other words, Commerce found that OceanInvest's reported costs were distorted for reasons separate from OceanInvest's COP reporting in the second administrative review.

In both administrative reviews, Commerce followed its practice of requiring a respondent to report costs on a product-specific basis and also of relying upon a respondent's normal books and records.  Moreover, in the first administrative review, Commerce stated that a respondent must calculate its raw shrimp costs based on the physical characteristics as defined by Commerce.  Id. (emphasis added).  Under Commerce's methodology, if the container weight or presentation differs, the control number differs.  Thus, in both reviews, Commerce was to treat container weight and presentation as separate physical characteristics in the control number.  Therefore, Commerce's acceptance of OceanInvest's reported costs in the Final Results was reasonable because those costs comported with Commerce's

normal practice, which is the statutorily preferred methodology pursuant to section 773(f)(1)(A) of the Tariff Act, 19.U.S.C. § 1677b(f)(1)(A).

## IV.   <u>CONCLUSION</u>

Commerce's determination that OceanInvest's reported raw material cost information for value-added products reasonably reflects its actual production costs is supported by substantial evidence and otherwise in accordance with the law.  Commerce's acceptance of OceanInvest's different raw material costs for similar finished shrimp products does not depart from agency practice.  For the foregoing reasons, the Court sustains Commerce's final determination and denies Ad Hoc Shrimp's motion for judgment on the agency record.

<u>/s/ Richard W. Goldberg</u>
**Richard W. Goldberg**
**Senior Judge**

Date:     **October 30, 2009**
          **New York, New York**